**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

Eileen Chollet, Dennis Ma,
Meryem Ghazal, Richard Ghazal,
Guadalupe Williamson, and Timothy
Williamson and their minor children,

        Plaintiffs,

v.

Scott Brabrand, in his role as Superintendent,
Fairfax County Public Schools,

        Defendant.

Case No. _____

## COMPLAINT

Plaintiffs Eileen Chollet and Dennis Ma, on behalf of their minor child, C.M., Meryem Ghazal and Richard Ghazal, on behalf of their minor child, P.G., and Guadalupe Williamson and Timothy Williamson, on behalf of their minor child, T.W. (collectively, "Plaintiffs"), hereby submit this complaint against Defendant, Scott Brabrand, in his role as Superintendent, Fairfax County Public Schools ("FCPS").  Plaintiffs allege the following:

## NATURE OF ACTION

1.      C.M., P.G., and T.W. (collectively, the "Minor Children") are students with disabilities who attend various schools within FCPS.

2.      FCPS closed for in-person learning during the 2020-2021 school year.  When Plaintiffs requested that FCPS allow their Minor Children to attend school in-person because in-person learning was necessary to meet the Minor Children's educational needs, FCPS refused.

3.      By refusing Plaintiffs' requests for in-person schooling in a situation where virtual schooling was not an effective substitute, FCPS effected a constitutional taking of the Minor

Children's protected property interests in their education in violation of the Takings Clause of the Fifth Amendment of the U.S. Constitution.

## PARTIES

4.     Chollet and Ma are the parents of C.M., an eight-year-old child who has attended school through FCPS since she was in preschool.  C.M. has a rare genetic condition called 2q23.1 microdeletion syndrome, which was found after she was evaluated for developmental delays by developmental pediatrics at one year old.  She has secondary diagnoses of autism spectrum disorder, attention deficit hyperactivity disorder (combined presentation), and a moderate intellectual developmental disorder stemming from her primary genetic diagnosis.  C.M.'s disability causes substantial deficits in motor control, speech production, attention, behavioral regulation, complex memory, processing speed, and emotional control.

5.     Meryem and Richard Ghazal are the parents of P.G., an eight-year-old child who attends school through FCPS.  P.G. has been diagnosed with autism spectrum disorder, sensory processing disorder, and global developmental delay.

6.     Guadalupe and Timothy Williamson are the parents of T.W., a ten-year-old child who attends school through FCPS.  T.W. has been diagnosed with an intellectual disability.

7.     FCPS is one of the largest school divisions in the United States, with 198 schools and centers.  As of the end of the 2019-2020 school year, FCPS served a diverse student population of more than 188,000 students in grades prekindergarten through 12.  14.7 percent of FCPS's students were reported as Students with Disabilities.  FCPS believes that each student is entitled to an excellent education that meets his or her individual needs, and is accountable for the academic achievement of all students.

## JURISDICTION AND VENUE

8.      This action arises under 42 U.S.C. § 1983 as a result of Defendants' deprivation of the Minor Children's rights as secured by the U.S. Constitution and federal law and the Virginia Constitution and Virginia law.  Accordingly, this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.  This Court has authority to award the requested damages under 28 U.S.C. § 1343(a), and attorneys' fees and costs under 42 U.S.C. § 1988(b).

9.      The Eastern District of Virginia is the appropriate venue for this action pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) because it is the District in which FCPS maintain offices, and it is the District in which substantially all of the events giving rise to the claims occurred.

## FACTUAL BACKGROUND

A.      **Pre-COVID-19.**

1.      *C.M.*

10.     Since the fall of 2015, C.M. has been receiving special education and related services as a student of FCPS.  C.M. attended preschool at Fairfax Villa Elementary School, a FCPS school, during the 2015-16, 2016-17, and 2017-18 school years.

11.     On April 13, 2018, C.M.'s IEP[1] team convened to discuss C.M.'s transition to Kindergarten for the 2018-19 school year.  Based on her academic, fine motor, speech, behavior, and social and emotional needs, C.M.'s proposed IEP included required hours of special education services per week in a self-contained setting, as well as special education support in general education specials.  Additionally, C.M. received occupational therapy ("OT"), speech and

---

[1] Under the Individuals with Disabilities Education Act ("IDEA"), an individualized education program ("IEP") is a written statement for a child with a disability that is developed, reviewed, and revised in meetings as provided under regulations and generally sets forth elements such as a statement of the child's levels of academic achievement and functional performance, measurable annual goals, how progress will be measured, and a statement of the special education and related services and supplementary aids and services to be provided to the child.  See 34 C.F.R. § 300.320.

language therapy ("S&L"), and adapted physical education ("APE") services in the special education setting from FCPS.

12. At the end of the 2018-19 school year, C.M. was promoted to the first grade. C.M.'s IEP team met on April 8, 2019 to propose an annual IEP for the 2019-20 school year. The team, including Chollet, agreed that C.M. would continue to benefit from special education services in a small group setting as she had been receiving.

13. During the 2019-20 school year, C.M. was a first grade student enrolled in the special education Enhanced Autism Program at Providence. Before March 2020, C.M. attended classes in-person. In these classes, C.M. learned in a highly structured setting. She was under constant supervision from teachers, therapists, and aides who have specific training and certifications for assisting young students with disabilities. At school, C.M. had access to special adapted equipment, like adapted scissors, in addition to non-adapted materials tailored to her needs, like visual schedules. C.M.'s in-person learning environment was well suited to help her meet the goals of her IEP.

14. C.M.'s April 3, 2020 IEP progress report demonstrated that she made significant progress toward all of her goals, earning 4s (sufficient progress) and 5s (Mastery) on the majority of her IEP goals and objectives. Much of that progress report was based on time that C.M. spent learning in-person prior to March 2020.

### 2. P.G.

15. P.G. has been a student in FCPS schools since the 2018-2019 school year, when he attended kindergarten at Forestdale Elementary School.

16. Since the 2019-2020 school year, P.G. has attended Franconia Elementary School ("Franconia"). P.G. is in the Enhanced Autism Program at Franconia.

17.     During the 2019-2020 school year, P.G. was starting to recognize sight words.  His focus was improving, and his language skills were progressing.

18.     P.G.'s anxiety had been improving as he settled into a routine at school.  Routine is very important to P.G.; when he knows what to expect, who he sees every day, and what is going on, his behavior improves dramatically.

### 3.     T.W.

19.     T.W. has been a student at Hybla Valley Elementary School ("Hybla Valley") in FCPS.

20.     At Hybla Valley, T.W. attended school in an integrated classroom, with non-special education students.  In that setting, T.W. worked with an aide for 40 minutes each day.  However, for three hours every day, T.W. was pulled into a special education classroom setting.

21.     Additionally, T.W. was receiving two hours of OT every month, and four hours of S&L every month.

22.     T.W.'s IEP provided for certain curriculum and classroom accommodations and modifications, including flexible schedule, visual aids, math aids, and reading the entire assignment to T.W.

### B.     COVID-19 Pandemic.

23.     On March 12, 2020, Governor of Virginia Ralph Northam declared a state of emergency and disaster within Virginia in response to COVID-19. The next day, Governor Northam ordered all Virginia K-12 schools to close for a minimum of two weeks, beginning March 16, 2020.  The following week, on March 23, 2020, Governor Northam ordered all K-12 schools to close for the remainder of the 2019-20 school year.

5

24.     On March 26, 2020, Dr. Scott Brabrand, Superintendent of FCPS, announced that FCPS planned to begin virtual learning for its nearly 189,000 students on April 14, 2020.

*1.     C.M.*

25.     As part of the normal yearly cycle, C.M.'s IEP was updated in April 2020.  Given that schools were ordered closed by Governor Northam, the April 2020 IEP stated that services for the remainder of the 2019-2020 school year "may be delivered in a variety of formats, such as telephone contact, emails, pre-recorded videos, and/or video conferencing sessions."  These were framed as part of a "Temporary Learning Plan" due to a "national emergency" and because "Governor Northam ordered all K-12 schools in Virginia to close."

26.     On April 30, 2020, C.M.'s IEP team met (virtually) to discuss ESY[2] services for C.M. for the summer following the 2019-2020 school year.

27.     The IEP noted that, with schools currently ordered closed by Governor Northam (as of April 2020), FCPS "does not know whether schools will be  opened or closed during the summer of 2020."  "The IEP team will reconvene by June 19, 2020 in order to determine appropriate ESY services to be provided based on the student's unique circumstances.  Those circumstances may include whether schools are open or closed." (emphasis added).

*2.     P.G.*

28.     When schools were closed in March 2020, P.G. was forced out of his routine and into virtual learning.  Seeing his teachers on the computer screen, rather than in person, caused outbursts from P.G., including smacking his computer screen.  The noise and distraction of virtual learning caused too much sensory stimulation for P.G.

---

[2] Under the IDEA, Extended School Year ("ESY") services means special education and related services that are provided to a child with a disability beyond the normal school year of the public agency, in accordance with the child's IEP, and at no cost to the parents of the child, and that meet the standards of the state education agency.  See 34 C.F.R. § 300.106(b).

29.     By the end of the 2019-2020 school year, P.G. had begun having panic attacks brought on by the virtual learning environment.

   *3.     T.W.*

30.     Virtual learning did not leave T.W. with a regular school schedule in the 2019-2020 school year.  After joining a morning meeting for half an hour, he would attend half an hour of language arts (instead of 1.5 hours in person), and half an hour of math (instead of 1.5 hours in person).  He also had half an hour of specials (physical education, art, or music).

31.     T.W. skipped virtual instruction for science and social studies altogether. Guadalupe Williamson was supposed to teach these subjects to T.W., but although she asked for a copy of the curriculum, she never received one from the school and had to buy a book herself online and teach him.

32.     Although T.W. was supposed to be receiving S&L therapy, his speech therapist did not meet with him virtually during the end of the 2019-2020 school year.

33.     During virtual learning, FCPS did not provide certain required elements of T.W.'s IEP concerning curriculum and classroom accommodations and modifications in the same manner as provided in-person.

**C.     2020-2021 School Year.**

34.     In July 2020, the State of Virginia issued its "Recover, Redesign, Restart" report (the "State Report").  The State Report included three "phases" of school reopening.  The most restrictive phase, Phase I, provided that, while "[r]emote learning is still the dominant method of instruction," "[s]chool divisions may elect to provide in-person instruction for students with disabilities in both extended school year services and school year special education services...with physical distancing."  The State Report also provided that students would "only attend such

programs if the [IEP] team agrees it is appropriate and the parent consents."  Furthermore, the Report recommended that, in Phase I, "[t]he number of persons in a classroom should not exceed 10."  Phases II and III were less restrictive than Phase I, and emphasized that "extended school year and special education services that are allowed in Phase I may continue to operate."

35.     On July 21, 2020, FCPS announced that the 2020-21 school year would begin with all students – including students with disabilities – attending virtually, beginning September 8, 2020.

36.     Other neighboring counties in Virginia made different plans.  For instance, starting September 8, Prince William County Public Schools announced that about 1,800 special education students and English language learners would get at least some in-person instruction.  Starting October 13, 2020, Loudoun County Public Schools were allowing up to two days a week of in-person instruction for about 850 students with special needs.  Fauquier County School Board went to a virtual instructional model through December 2020, but provided face-to-face instruction to certain special education students based on the services required according to their IEPs.  Stafford County School Board similarly made exceptions to its virtual learning plan for students in special groups such as special education.

37.     Some private schools in Fairfax County also moved forward with in-person instruction during the 2020-2021 school year.   For example, Gesher Jewish Day School started the school year and remained open for in-person learning throughout the year, suffering only four positive cases of COVID-19 (three staff, one student) from September 2020 through January 2021.  Also, the Oakwood School in Annandale conducted school in-person for the entire school year.  All Catholic schools in Fairfax County remained open, including the school attended by T.W.'s sibling.

38.     World-wide, other school districts remained open even in the face of rising case counts.  For example, in fall 2020, when much of Europe and the United States were seeing a rising number of cases of COVID-19, countries such as France, the United Kingdom, Germany, and Italy kept schools open for in-person learning for all students not just those with significant learning challenges.  In November 2020, Andreas Schleicher with the Organization for Economic Co-operation and Development said, "I do think people have understood fairly quickly how much damage the school closures have done, particularly to disadvantaged learners."[3]

39.     On August 14, 2020, rather than announce in-person learning for students with disabilities, Fairfax County and FCPS announced a new program for the 2020-21 school year – the Supporting Return to School program ("SRS").  SRS provided full day on site programming for children, Kindergarten through sixth grade, residing in Fairfax County and City of Fairfax, Monday through Friday, 7:30 a.m. to 6:00 p.m. starting September 8, 2020 (the same day as the FCPS 2020-21 school year began).  Among other programming, SRS provided support for children's active and engaged learning during the FCPS virtual academic day.  As of January 4, 2021, the SRS program was available at 47 different FCPS schools, including Providence.

40.     SRS accommodated approximately 60 children per site, in classrooms of groups of no more than 10 children.[4]  The children were to stay together each day, along with consistent staff to support their online learning and in-person connections.

---

[3] Anya Kamenetz, "Lessons From Europe, Where Cases Are Rising But Schools Are Open," November 13, 2020, available at https://www.npr.org/2020/11/13/934153674/lessons-from-europe-where-cases-are-rising-but-schools-are-open#:~:text=Europe%20Keeps%20Schools%20Open%20Despite%20Coronavirus%20Lockdowns%20Amid%20a%20new,has%20taken%20a%20different%20approach.

[4] For comparison, the classrooms in the Enhanced Autism Program through FCPS served fewer than 10 students prior to COVID-19.

41.     While SRS accommodated children with special needs, SRS also would "not provide academic instruction."   "The program is not designed to replace or duplicate virtual learning, but to support it by ensuring students are able to access the FCPS academic day and have the technical support and engagement they need to succeed."[5]

42.     And SRS was not even provided as a public education resource to parents.  Rather, FCPS and Fairfax County charged monthly fees for children attending SRS.  For households with adjusted household income above $131,000 per year, FCPS and Fairfax Country charged households $1,472 per child per month simply to attend SRS.  Households with lesser income paid on a sliding scale but no less than $80 per child per month to "attend" SRS.

**D.     Effects of COVID-19.**

43.     During the 2020-2021 school year, COVID-19 disproportionately caused severe symptoms and deaths in elderly individuals, not in school-age children.  In Fairfax County, there were zero deaths from COVID-19 in people 19 years old or younger during the 2020-2021 school year.[6]  In Virginia, there have been ten such deaths between March 2020 and August 2021.  For comparison purposes, Virginia suffered six deaths in children 17 years old or younger due to seasonal influenza during the 2019-2020 influenza season.[7]

---

[5] https://www.fairfaxcounty.gov/office-for-children/supporting-return-school-program

[6] The "Delta" variant of the SARS-CoV-2 virus may be more contagious or virulent in children than prior iterations of the virus.  See, e.g., Riley, S. et al., "REACT-1 round 12 Report: resurgence of SARS-CoV-2 infections in England associated with increased frequency of the Delta variant." Imperial College London, June 17, 2021.  However, the Delta variant did not begin affect large numbers of Americans until after the end of the 2020-2021 school year and it still predominately affects older, non-vaccinated, individuals.

[7]     https://www.vdh.virginia.gov/coronavirus/covid-19-in-virginia-demographics/   (accessed August 23, 2021).

| Deaths by COVID-19, Fairfax County | | | | | | |
|---|---|---|---|---|---|---|
| *Age Group* | 0-19 | 20-29 | 30-39 | 40-49 | 50-59 | 60+ |
| *Number of Deaths by Age Group* | 0 | 5 | 13 | 34 | 92 | 1,012 |
| *Number of Deaths by Age Group as a Percentage of Total Deaths* | 0 | 0.4% | 1.1% | 3.0% | 8.0% | 87.7% |

| Deaths by COVID-19, Commonwealth of Virginia | | | | | | |
|---|---|---|---|---|---|---|
| *Age Group* | 0-19 | 20-29 | 30-39 | 40-49 | 50-59 | 60+ |
| *Number of Deaths by Age Group* | 10 | 32 | 101 | 276 | 871 | 10,373 |
| *Number of Deaths by Age Group as a Percentage of Total Deaths* | 0.09% | 0.3% | 0.9% | 2.4% | 7.5% | 89.0% |

44.     Another potentially concerning outcome of COVID-19 in children is multisystem inflammatory system in children ("MIS-C").  As of August 23, 2021, 81 children had been diagnosed with MIS-C since the start of the COVID-19 pandemic in March 2020.[8]  The school-age population in Virginia as of July 1, 2019 was approximately 1,585,492, according to the Virginia Department of Education; as such, the prevalence of MIS-C in Virginia school-age students was approximately 0.005% through August 2021.

---

[8]     https://www.vdh.virginia.gov/coronavirus/covid-19-data-insights/covid-19-in-virginia-mis-c/ (accessed August 23, 2021).

45.     Teachers may fall into higher risk demographics than students, but the majority of Virginia public school teachers are in lower-risk categories of adults for hospitalization or death. According to the U.S. Department of Education National Center for Educations Statistics Schools and Staffing Survey Public School Teacher Data File, only 20.8% of Virginia's teachers were over 55 years old as of the most recent collection of data.  As shown above, adults in lower age ranges show a much lower risk of death from COVID-19 than elderly people.  In addition, FCPS teachers were eligible to be vaccinated along with emergency personnel and other front-line workers beginning January 11, 2021.[9]

46.     Furthermore, schools across the country utilized a range of mitigation strategies to lower the risk of COVID-19 transmission in school settings.  Studies released during the 2020-2021 school year tended to show that, "[w]hen a combination of effective prevention strategies is implemented and strictly adhered to in the K-12 in-person learning environment, the risk of transmission in the school setting appears to be lower than or equivalent to the transmission risk in other community settings."[10]

---

[9] "Vaccinations Begin Week of Jan. 11 for Eligible 1b Populations," Fairfax County Emergency Information, available at https://fairfaxcountyemergency.wpcomstaging.com/2021/01/08/vaccinations-begin-week-of-jan-11-for-eligible-1b-populations/ (Last accessed August 23, 2021).

[10] Center for Disease Control and Prevention, "Science Brief: Transmission of SARS-CoV-2 in K-12 schools," updated March 19, 2021, available at https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/transmission_k_12_schools.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fmore%2Fscience-and-research%2Ftransmission_k_12_schools.html#ftn-54 (last accessed June 1, 2021), citing Fricchione MJ, Seo JY, Arwady MA, "Data-Driven Reopening of Urban Public Education Through Chicago's Tracking of COVID-19 School Transmission." *J Public Health Manag Pract*. 2020; Published online ahead of print 2020 December 30. doi:10.1097/PHH.0000000000001334

47.     For the 2021-2022 school year, the CDC has recommended that schools return to in-person learning, even when certain mitigation strategies such as vaccines and social distancing are not available.[11]  Furthermore, the CDC's most recent guidance recognizes that "federal and state disability laws may require an individualized approach for working with children and youth with disabilities consistent with the child's [IEP].  Administrators should consider adaptations and alternatives to prevention strategies when serving people with disabilities, while maintaining efforts to protect all children and staff from COVID-19."[12]

48.     Given the relatively low risk of COVID-19 to school-age children, the relative demographics of Virginia's public school teachers, and the mitigation strategies that lowered the transmission risk to both populations, the risk of COVID-19 was not sufficient to justify the refusal to allow students like Plaintiffs to return to in-person learning.

**E.      Plaintiffs' Interactions with FCPS in 2020-2021 School Year**

49.     Despite multiple requests to FCPS personnel to allow the Minor Children to learn in person during the 2020-2021 school year, FCPS refused to permit the change to its policies. This was in spite of the fact that the Minor Children needed in-person learning to access educational benefits, virtual learning caused them to fall behind the progress envisioned in their IEPs, and that in-person learning could have been provided by FCPS to the Minor Children safely.

---

[11] "Guidance for COVID-19 Prevention in Kindergarten (K)-12 Schools," Centers for Disease Control and Prevention, updated July 9, 2021, available at cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-guidance.html.

[12] Id.

    *1.*    ***C.M.***

50.    On August 6, 2020, Chollet spoke via telephone with Dawn Schaeffer and Kristina Roman of FCPS.  On that date, FCPS confirmed that no in-classroom services would be offered as an accommodation for students with disabilities.

51.    During an IEP meeting held on September 3, 2020, FCPS proposed much less special education services than C.M. had received in prior school years.  For instance, FCPS proposed that C.M. would receive 11.5 hours of services in the special education setting (down from over 20 from the 2019-20 school year) and 1.5 hours in the general education setting.  FCPS proposed that C.M. would receive 2.0 hours of APE (Virtual) services each month, 3.0 hours of S&L (Virtual) services each month, and 1.0 hour of OT (Virtual) services each month.  FCPS did not consider any other options for services.  FCPS noted, "Due to COVID-19, [FCPS] will begin with virtual instruction for the opening of the 2020-21 school year.  Students with disabilities may have the opportunity to return to in-person school services on a part or full time basis when health conditions improve and upon School Board approval."

52.    Because of her disability, C.M. cannot meaningfully benefit from a virtual education.  Because of C.M.'s deficits, she is unable to access a virtual classroom without one-on-one in-person assistance.  She lacks the motor control to use a mouse or a touchpad effectively. C.M. requires in-person hand positioning and guidance to effectively use common school materials, such as scissors or a pencil.  She is unable to read.  Her attention, reasoning, and memory deficits mean she cannot follow the multi-step directions required for successful participation in virtual coursework.  She requires frequent, in-person redirection and positive reinforcement to attend to multiple school-related activities because of her behavioral and emotional deficits.

53.     An in-person classroom small group setting where she is able to practice appropriate social behavior and emotional control in the presence of her peers is the only setting in which C.M. can receive a free, appropriate public education.

54.     On September 6, 2020, Chollet emailed Shannon Rodriguez, Kristina Roman, and Dan Phillips at FCPS.  Chollet wrote that she did not consent to any changes in C.M.'s IEP, including any change of placement from school settings to virtual, or the number of service hours C.M. was receiving.  Chollet requested state-led mediation between her and FCPS to work through C.M.'s IEP.  Chollet also requested an alternative appropriate placement: opening a single classroom for C.M. and her classmates at Providence as a pilot program, to give FCPS an opportunity to see how different in-person learning procedures would work in practice before full-scale, in-person return to school.

55.     September 8, 2020 was the first day of virtual school for students of FCPS.

56.     In an attempt to resolve the impasse with FCPS, Chollet met with FCPS Region 5 Executive Principal Davit Jagels and Region 5 Assistant Superintendent Rebeca Baenig.  Chollet also had a call with FCPS Interim Assistant Superintendent for Special Services Mike Bloom.  The meetings did not resolve any of the issues with C.M.'s virtual learning.  At the meetings, the FCPS representatives told Chollet they could not do anything until FCPS finished certain "return-to-school" metrics.  Upon information and belief, these metrics were not a county or state requirement, but had been self-imposed by FCPS.

57.     On September 24, 2020, Rory Duffield of FCPS emailed Chollet.  Duffield asked what issues she was seeking to mediate.  He wrote, "FCPS generally finds mediation useful in cases where there are possible solutions to the conflict.  We are not sure that during the current circumstances with COVID if the outcome you seek is possible."

15

58.     On September 24, 2020, Chollet responded to Duffield's email.  She wrote:

> The outcome I'm seeking is for [C.M.] to return to school in person
> five days per week to accommodate her necessary service hours.  In
> know this is possible because neighboring school districts are doing
> it (Fauquier, Prince William, Stafford).  Furthermore, it is possible
> because, regardless of who the staff are, you are allowing general
> education students in [C.M.]'s class five days per week for
> supported learning in cohorted classes of 10 kids, exactly the same
> physical setup that [C.M.]'s class has normally.

59.     On October 2, 2020, Jane Strong of FCPS responded to Chollet's email.  She wrote that FCPS declined to mediate the services offered to C.M.

60.     On October 27, 2020, C.M. returned to in-person instruction four days each week through the Enhanced Autism Program.

61.     On December 14, 2020, FCPS again ended in-person instruction and went back to all-virtual learning.  C.M. did not return to in-person learning until February 16, 2021.

62.     In C.M.'s most recent draft IEP, her teacher documented quantitatively how far C.M.'s behavior has degraded during the school closures.  Her IEP team has commented that the major impediment to C.M.'s academic progress is her behavior.  C.M. has to be held back in the second grade in the upcoming school year because her behavior precludes any participation in general education at the third grade level.

*2.     P.G.*

63.     Meryem and Richard Ghazal attempted to intervene with FCPS prior to the 2020-2021 school year to allow P.G. to return to in-person learning.  When they asked, one FCPS staff member told them that such decisions were "above my pay grade."

64.     The Ghazals notified P.G.'s IEP team that virtual learning was not appropriate for P.G.'s learning style, which required prompts and hand-over-hand instruction to implement.

16

Additionally, P.G. had anxiety over virtual learning, causing him to refuse to attend school virtually.

65.     The Ghazals also explored alternative means for P.G. to learn virtually.   For example, the Ghazals proposed hiring a board certified behavior analyst ("BCBA") to assist P.G. with virtual learning.   The Ghazals asked FCPS to pay for the BCBA; FCPS refused.   Upon information and belief, other parents had tutors that would come to their home to help children with virtual school, and FCPS paid for those services.   The Ghazals also asked if they could hire a teacher to help P.G. do virtual school at home; FCPS refused that proposal as well, stating no teachers were willing to do so.

66.     The Ghazals requested that FCPS mediate these alternative learning methods. FCPS refused mediation.

67.     Given P.G.'s panic attacks from virtual learning, and faced with no other options, the Ghazals did not send P.G. to FCPS for the 2020-2021 school year.   Instead, P.G. attended applied behavior analysis ("ABA") therapy every day.   ABA therapy is a common form of therapy for children with autism spectrum disorder.   P.G. attended ABA therapy in-person for six hours each day during the 2020-2021 school year.

68.     The cost of P.G.'s ABA therapy during the 2020-2021 school year was approximately $5,000 per month.

*3.*     *T.W.*

69.     Guadalupe Williamson had a teleconference call with T.W.'s case manager and IEP team on August 28, 2020 regarding an addendum to his IEP to allow him to start the school year receiving virtual learning.   During that teleconference, Williamson told the IEP team that virtual learning was challenging for T.W.   The IEP team agreed.   Williamson told the IEP team T.W.

wished to attend school in person.  Williamson told the IEP team that her family had answered FCPS's online survey on learning preference indicating so.

70.     The IEP team told Williamson that the hope was to return to in-person learning as soon as possible, but at that point all FCPS students would begin the year learning virtually.

71.     At that time, based on emails she had received from FCPS throughout the summer regarding the return to school, Williamson believed that in-person learning would begin that fall. For instance, in June and July 2020 Williamson received emails from her school board member representative, Defendant, and Hybla Valley regarding the two options to return to school in the fall: Virtual, and Hybrid (two days in person, and two days virtual).  It was not until July 21, 2020 that FCPS announced that all students would begin virtually for the first quarter of the school year, and that FCPS would bring students back to school as soon as possible, starting with elementary school students, select pre-K through twelfth grade special education students, and English learners.

72.     FCPS personnel asked Williamson to sign a change to T.W.'s IEP that would allow for virtual learning until in-person learning started.    Given her belief that those students would return to school in the fall, Williamson signed the IEP addendum that T.W. would begin the year receiving virtual learning.

73.     The IEP addendum included reduced hours from what T.W. had been receiving in the in-person learning environment prior to March 2020.  For instance, prior to virtual learning, T.W. had received 200 minutes per week of special education support during general education science and social studies classes.  During virtual learning, T.W. received zero minutes per week of special education support in those subjects.  T.W.'s time in special education classroom was cut from 15 hours per week when learning in-person to 4.5 hours per week learning virtually.

Language arts and math were each cut from 450 minutes per week during in-person learning to 120 minutes per week in virtual learning.   Furthermore, the IEP addendum reflected that the annual IEP service hours and goals would be implemented when instruction "could again take place in a brick and mortar school setting."

74.     The IEP team considered having T.W. work virtually through the entire class daily schedule, but this plan was rejected by the IEP team because of T.W.'s special needs and his inability to focus for so many hours of virtual instruction.

75.     As part of the FCPS reopening plan, T.W. was slotted into "cohort 3" for returning to in-person learning.  The original plan was for T.W. to return to in-person learning along with other students from cohort 3 on October 27, 2020.

76.     One week before T.W. was to return to in-person learning, FCPS personnel informed Williamson that T.W. was the only student in cohort 3 at Hybla Valley.  Because T.W. was the only student in that cohort, FCPS would not allow T.W. to return to in-person learning with a teacher.   Instead, FCPS offered Williamson two options: either T.W. could continue schooling virtually from home; or he could attend school in-person with a "classroom monitor," who would supervise T.W. while he continued learning through a computer.

77.     Williamson asked if T.W. could attend a school other than Hybla Valley with cohort 3 students who were able to return with teachers.  FCPS refused.

78.     FCPS initially told Williamson that T.W. would be able to return in-person in January when all the other third graders returned to Hybla Valley.  Eventually, upon the insistence of Guadalupe Williamson and multiple phone conversations with the Procedural Support Liaison and Hybla Valley's Assistant to the Principal, eventually FCPS agreed to place T.W. with other students in cohort 5 who would come back to Hybla Valley in two weeks.

79.     The day before T.W. was to return to in-person learning with the cohort 5 students was November 16, 2020, the day that FCPS paused bringing back any more students to in-person learning.  If T.W. had been sent back to school with cohort 3, as originally scheduled, he would have continued in-person instruction from October 27, 2020 to December 14, 2020, when FCPS ended in-person instruction and went back to all-virtual learning.

80.     T.W. was devastated by the news that he would not be returning to school in-person. His behavior regressed and he began exhibiting the behaviors of a younger child.  Emotionally, T.W. was either sad and quiet, or angry, aggressive, and defiant toward his siblings and parents. He rarely smiled.  He refused to do any school work or house chores with his parents at home.  He increasingly exhibited physical movements consistent with a diagnosis of autism spectrum disorder, a disorder that T.W. had not been previously diagnosed with.  He would rock, fidget, flap, and avoid eye contact.  T.W.'s vocabulary decreased, and he became overweight.  One of T.W.'s siblings, who continued attending private school in-person in Fairfax County, did not exhibit the same regressions.  When Williamson's mother visited in January, she told Williamson that she noticed a change in T.W.'s behavior.  Williamson believes the change was brought on by the lack of in-person learning opportunity for T.W.

81.     T.W. was finally able to return to in-person learning in February 2021.  Although he was part of cohort 3, and should have been brought back on February 16, 2021, the Williamsons were told that because T.W. was the only member of cohort 3 at Hybla Valley, his return to school was delayed another week to February 23, 2021.

82.     Plaintiffs were damaged by FCPS's failure to provide them in-person schooling. During that time, Plaintiffs did not receive the same educational benefit as they had received while

attending school in person.  They also did not receive the same degree of educational benefit as other students who did not have the same disabilities as Plaintiffs.

83.     Plaintiffs' damages were caused by FCPS's failure to offer in-person instruction to Plaintiffs, who was unable to obtain the benefits of public education through virtual instruction because of their disabilities.

84.     FCPS knew or should have known that Plaintiffs were unable to obtain the benefits of public education through virtual instruction.

## CLAIM FOR RELIEF

### COUNT I – 42 U.S.C. § 1983

85.     Paragraphs 1 – 84 of Plaintiffs' complaint are incorporated as if restated herein.

86.     FCPS subjected the Plaintiffs and the Minor Children to conduct that occurred under color of state law when FCPS denied the Minor Children in-person instruction in a physical special education environment and failed to consider the Minor Children's individual needs.

87.     The Minor Children were unable to access a virtual education without a physical class environment and in-person support structure.  The Minor Children's emotional and behavioral regression since virtual learning began shows that they needed this support in their education in order to access their rights to a public education.

88.     FCPS was using power supposedly possessed by virtue of state law when it denied the Minor Children their rights to an education because FCPS was given the power to offer in-person instruction, especially to students with disabilities, by virtue of the Commonwealth of Virginia's school reopening plan.

89.     FCPS's denial of in-person instruction, despite the requirements of the Minor Children's IEPs and without consideration of their individual needs, deprived the Minor Children

of their property interest in a public education as provided by the Virginia Constitution and Statutes, violating the Takings Clause of the Fifth Amendment of the U.S. Constitution.

90.     Plaintiffs have been denied their property rights in their child's education by virtue of the actions of FCPS.  By refusing to allow the Minor Children to learn in-person, FCPS caused Plaintiffs to provide one-on-one assistance to the Minor Children.  Plaintiffs would not have had to do so if FCPS had not denied Plaintiffs' requests for the Minor Children to learn in-person. If Plaintiffs had not provided one-on-one support to the Minor Children, the Minor Children would have been unable to attend virtual school, which would have subjected Plaintiffs to legal penalties for truancy.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully asks that this Court grant the following relief:

a.     Compensatory damages for the taking of the Minor Children's protected property interests in a public education;

b.     Punitive damages; and

c.     Any and all further relief as this court deems just and appropriate including court costs and attorney's fees.

22

## **JURY DEMAND**

Plaintiffs demand a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: August 25, 2021

Respectfully submitted,

  /s/ George M. Clarke

George M. Clarke
Virginia Bar No. 66549

BAKER & MCKENZIE LLP
815 Connecticut Avenue NW
Washington, DC 20006

Robert S. Walton
Illinois Bar No. 6238431
(*pro hac vice* motion forthcoming)
Daniel B. Wharton
Illinois Bar No. 6310469
(*pro hac vice* motion forthcoming)

BAKER & MCKENZIE LLP
300 East Randolph Street, Suite 5000
Chicago, IL 60601
(312) 861-2680